ISEN ET UX. *v.* PHOENIX ASSURANCE COMPANY OF NEW YORK

[No. 102, September Term, 1970.]

*Decided November 13, 1970.*

The cause was argued before HAMMOND, C. J., and MC-WILLIAMS, FINAN, SMITH and DIGGES, JJ.

*Joseph Montedonico,* with whom were *Donahue, Ehrmantraut & Gleason* on the brief, for appellants.

*Joseph C. Roesser,* with whom was *Arthur V. Butler* on the brief, for appellee.

MCWILLIAMS, J., delivered the opinion of the Court.

Here we are urged to set at naught the judgment of the Circuit Court for Montgomery County in favor of the appellee (Phoenix) against the appellants (the Isens) for $1232.92. In doing so we shall indulge in still another comment in respect of infractions of Maryland Rule 535.

The Colstons live at 7400 Western Avenue in Chevy Chase. A little after 11 o'clock on the night of 20 March

1966 they heard "a big thump in the front" of the house. Jumping out of bed they discovered instanter that the front end of a 1964 Oldsmobile Cutlass had breached their front door. The police were summoned and it was soon discovered that the intruder belonged to the appellant, David Isen, their next-door neighbor. In due course Phoenix paid the Colstons for the cost of the repairs and thereupon, by virtue of its policy of insurance, became subrogated to their rights. In July 1968 Phoenix sued David Isen. After routine discovery procedures it amended its declaration to make the appellant Mildred Isen a party defendant. In the amended declaration it alleged that Mildred "negligently, carelessly and imprudently" parked the car in such a manner that it "did freely and in an uncontrolled manner roll down an incline" and strike the Colston house. It alleged also that David "negligently, carelessly and imprudently" permitted this to happen. The case came on for trial before Shook, C. J., without a jury, on 24 February 1970.

Phoenix called Walker Colston as its first witness. He described the "big thump" around 11:00 p.m. and the presence of the Isen car in his front door. He said he observed "automobile tracks" coming "down the hill, apparently from our next-door neighbor." Mildred Isen, he added, came over later, expressed regret and said not to worry — they were insured. Counsel for Phoenix then called Mildred Isen "as an adverse witness under Rule 35." We shall assume he had in mind Code (1965 Repl. Vol.), Art. 35, § 9.

She testified the Cutlass was in her husband's name and that she had his consent to use it. He was out of town at the time. It has an automatic transmission. She said when she parked the car "in the circular driveway in front" of the house "about 6:30 in the evening" she "automatically put it in gear." What follows is an excerpt from her testimony:

"Q. Is it not a fact on the date of March 20, 1966, you did not put the car in gear?

"A. I can't answer that, no sir, because I did put it in gear.

"Q. Do you remember when we took your testimony on December 23, 1968?

"A. Yes, sir; I do.

"Q. And in referring to page 8 of the transcript:

'Question: What did you do when you parked the car? Is it an automatic transmission?

'Answer: Yes.

'Question: What did you do?

'Answer: I just turned the key off and put my foot on the brake and went into the house.

'Question: This was approximately what time?

'Answer: Oh, between 6:30 and quarter of seven in the evening.

'Question: Did you lock your car at that time?

'Answer: I don't honestly remember.'

"Do you remember giving those answers to those questions?

"A. Yes, sir.

"Q. At that time you said nothing about putting it in gear, did you?

"A. Well, I automatically put the car in gear.

"Q. At that time did you turn your wheels toward the front of the house and away from the street?

"A. I turned them toward the driveway, toward an exit.

"Q. Going to the street?

"A. Yes, sir; uh huh."

\* \* \*

"Q. Isn't it a fact, Mrs. Isen, that at the time

you parked your car, March 20, 1966, you don't know whether you put the emergency brake on your car or not?

"A. I automatically do, sir.

"Q. In this case you don't have any knowledge that you did, in fact, do it, though?

"A. I assume I did because I usually — it's just automatic with me, sir."

She next heard of the car when two police officers came to the door. They wanted her to remove the car from the Colston property. She refused but she gave one of the officers her keys and he "had no difficulty driving" the car back to her driveway.

Except for several witnesses whose testimony dealt exclusively with the question of damages Phoenix thereupon rested its case. What follows is an excerpt from the transcript of the record.

"THE COURT: Mr. Montedonico [counsel for the Isens], do you want to come up?

"(Bench conference not reported.)

"THE COURT: Motion for the defense is denied."

\* \* \*

"THE COURT: I understand the Plaintiffs rest, \* \* \*."

"MR. BUTLER: Yes, Your Honor.

"THE COURT: All right.

"MR. MONTEDONICO: Your Honor, I have no case.

"THE COURT: You rest your case?

"MR. MONTEDONICO: I rest my case and move for a directed verdict, as I did for the Plaintiff's case."

\* \* \*

"THE COURT: You gentlemen want to say anything else?

"MR. MONTEDONICO: Renew the motion.

"THE COURT: Do you want to argue anything more?

\* \* \*

"JUDGE SHOOK: On the basis of the evidence before me, first on the Plaintiff's case, the fact that the Defendant's automobile, the Defendant Mrs. Isen struck the house of the Plaintiff, and the fact that the Plaintiff elicited from the Defendant Mrs. Isen the fact that she assumed that she put on the brake and put the car in gear, because this was her general practice; it was automatic with her, nevertheless would in my mind raise a serious question that would require me to let the case go to the jury, on the motion for a directed verdict by the Defendant.

"If this case were being held by a jury to determine whether or not in fact it was negligence on the part of the Defendant, the Defendant not meeting that question that was in the Court's mind, the Court finds for the Plaintiff in the amount of one thousand, two hundred thirty-two dollars ninety-two cents.

"Your exhibits, gentlemen, if you will take care of them yourselves, court stands adjourned."

The Isens contend that Judge Shook erred when she denied their motion for a "directed verdict." In *Smith v. State Roads Commission*, 240 Md. 525, 539 (1965), we pointed out that in actions tried by the court without a jury a "motion for a directed verdict" is not a proper motion. We explained carefully and at length that Rule 535 "was designed especially for non-jury situations." We noted in *Duck v. Quality Custom Homes, Inc.*, 242 Md. 609, 611 (1966), an appeal from the Circuit Court for Montgomery County, that Rule 535 had not been complied with. In *Southwestern Mines, Inc. v. P. & J. Coal Company, Inc.*, 244 Md. 180, 184 (1966), we said "this [a motion for a directed verdict] is not a proper motion." In *Lewis v. Germantown Insurance Company*, 251

Md. 535, 536-37 (1968), another appeal from the Circuit Court for Montgomery County, we chided the bar for its disregard of the Maryland Rules, especially Rule 535. We cited nine cases in each of which some mention had been made of the bar's dereliction in this regard. In *Antietam-Sharpsburg Museum, Inc. v. William H. Marsh, Inc.*, 252 Md. 265, 267 (1969), we said, "Once again we remind both *bench* and bar that the motion for a directed verdict, in these circumstances, is improper. Maryland Rule 535." (Emphasis added.) Perhaps we should expect that there will always be some members of the bar who will be unaware of the Rules and our decisions concerning them but one would suppose that, by now, trial judges, being fully informed, would either reject or refuse to act upon such improper motions. That we have chosen once more to twit both bench and bar in this regard should not provoke speculation that we have done so for any reason other than to focus attention upon the Rules and to remind all hands that they are not guides to the practice of law but precise rubrics "established to promote the orderly and efficient administration of justice and [that they] are to be read and followed." *Brown v. Fraley*, 222 Md. 480, 483 (1960).

Because of its relevance to the instant case we shall repeat what we said in *Lewis, supra*:

> "* * * [Appellee] did not move to dismiss Lewis' appeal and we have chosen not to do so nostra sponte. It must not be supposed, however, that the same degree of forbearance will be displayed, in the future, in respect of a similar disregard of the Maryland Rules." *Id.* at 543.

Neither was there any such motion here but we have elected not to dismiss the appeal because we think Judge Shook should have refused to receive the Isens' motion for a directed verdict and that, having done so, she should have required them to move to dismiss under Rule 535. And, since we are fully persuaded that "on the facts and

the law \* \* \* [Phoenix] has shown no right to relief" we think a motion to dismiss should have been granted.

We have made it clear, we believe, that in cases where a motion to dismiss under Rule 535 has properly been filed, the trial judge should approach the testing of the legal sufficiency of the evidence produced by the plaintiff just as he would approach an appraisal of the evidence in a jury case upon the filing of a motion for a directed verdict. *Smith v. State Roads Commission, supra,* and *Allen v. Steinberg,* 244 Md. 119, 122-23 (1966). He is required, therefore, in non-jury cases, to consider the evidence and all logical and reasonable inferences deducible therefrom in a light most favorable to the plaintiff. *Trusty v. Wooden,* 251 Md. 294, 297 (1968) ; *Finneran v. Wood,* 249 Md. 643 (1968) ; *Raff v. Acme Markets, Inc.,* 247 Md. 591 (1967). The trial judge should be mindful, however, that the words "legally sufficient" have significance. As Chief Judge Prescott said, for the Court, in *Fowler v. Smith,* 240 Md. 240, 247 (1965) :

> "\* \* \* They mean that a party who has the burden of proving another party guilty of negligence, cannot sustain this burden by offering a mere scintilla of evidence, amounting to no more than surmise, possibility, or conjecture that such other party has been guilty of negligence, but such evidence must be of legal probative force and evidential value."

In *Trusty v. Wooden, supra,* a jury case, the plaintiffs called the defendant Wooden "as a hostile witness." When the plaintiffs rested their case Mrs. Wooden moved the court to direct a verdict in her favor. Her motion was granted. What we said there is of interest here:

> "It is at once apparent that without Mrs. Wooden's testimony there is absolutely no evidence to show how the accident happened. Neither Cousins nor Trusty saw the car before it struck them. There is no evidence that either of them heard

it. The only other eyewitness, Olivia Neuman, was not called nor was the police officer who investigated the accident. Had appellants rested at this point the doctrine of *res ipsa loquitur* might well have come into play, in which case the defendant would have been obliged to go forward with the evidence." *Id.* at 297.

Since Phoenix has foregone reliance on *res ipsa loquitur* we must look to the evidence to see just what has been proved. Mrs. Isen said she "did put the car in gear." She "turned the key off and put * * * [her] foot on the brake and went into the house." She did not remember whether or not she locked the car. She said she "automatically put the car in gear." She "assumed" she put on the emergency brake because it was "just automatic" with her. She turned her front wheels "toward the driveway" toward the exit "going to the street." Her testimony also disclosed that four and one-half hours later she gave her ignition key to a police officer who drove the car back to her driveway; the car has an automatic transmission; the Isen property is higher than the Colston property. It was conceded at argument that the parking brake on the Isen car is applied by foot pressure and released by a lever operated by hand.

Phoenix admits that it is bound by Mrs. Isen's testimony unless it is contradicted or discredited. *Williams v. Wheeler,* 252 Md. 75 (1969) ; *Trusty v. Wooden, supra.* But, it argues, Mrs. Isen's "testimony was self-rebutted." We seem unable to grasp this argument. It is surely common knowledge that contemporary automobiles, with but few highly sophisticated exceptions, have either manual transmissions or fully automatic transmissions and that they have parking brakes which are set either by a lever operated by hand or a pedal operated by one's foot. Familiar to all is the fact that leaving a car, with a manual transmission, "in gear," i.e., in either first or reverse gear, has a distinct braking effect. Equally familiar is the fact that, in cars with automatic transmissions, the mov-

ing of the selector to "Park" locks up the transmission so that the effect is much the same as leaving a car with a manual transmission in either low or reverse gear. Few indeed are the women who understand why these things are so and equally few are the ones who use the correct terms to describe the machinery and how it is operated. We entertain no doubt whatever that when Mrs. Isen said she "put it in gear" she meant that she moved the selector to the park position. Indeed she could not have meant anything else because as she came to a stop her selector must then have been "in gear," i.e., in the drive position; had it not been she could not have gotten up the incline to her front door. Nor have we any doubt that when she said she "put her foot on the brake" she meant that she set the parking brake with her foot. To borrow a phrase from Chief Judge Fuld, of the Court of Appeals of New York, "it would defy reason to hold" [1] that Mrs. Isen did not do the very same things any reasonably careful and prudent driver would have done in the circumstances, i.e., "turn the key off," set the parking ("emergency") brake and move the gear selector ("put it in gear") to P (park). Had she not performed at least one of the second and third operations the car would have rolled off as soon as she stepped out. That nothing happened for more than four hours certainly confirms our understanding of what she meant. We have found nothing in the record suggesting that her testimony has been rebutted, contradicted or in any way discredited.

Phoenix, however, reminding us of our obligation to view the evidence, and especially the inferences deducible therefrom, in a light most favorable to it, seems to be saying that the evidence will support a finding that Mrs. Isen did *not* "place the car in gear" and that she did *not* step "on the emergency brake." It seems also to be saying that the evidence will support a finding that she did not turn her front wheels toward the street because, it argues, had she done so her car would not have

---

1. *Derby v. Prewitt*, 12 N.Y.2d 100, 236 N.Y.S.2d 953 (1962).

barged into the Colstons' front door. We are indeed mindful of our duty to look upon the evidence in a light most favorable to Phoenix but this does not mean that we are obliged to torture the evidence or to attempt the deduction therefrom of illogical and unreasonable inferences. Phoenix complains because the Isens failed "to show that the 'emergency' brake, if applied, would have held indefinitely" and that "there was no testimony from the defendants [the Isens] as to any intervening causation." This seems incredibly ingenuous. Mrs. Isen was produced as a hostile witness. She was obliged to answer questions, nothing more. Phoenix, having spurned *res ipsa loquitur,* had both the burden of proof and the burden of going forward with the evidence. It alone was saddled with the necessity of putting together a prima facie case. We think not only has it failed to do this but that, unwittingly perhaps, it has provided evidence from which an inference of intervening cause might arise. Mrs. Isen, asked if she turned her wheels toward the front of the house, said she turned them toward an exit going to the street. This was not contradicted, nor discredited, nor rebutted and, absent any explanation as to why the car rolled down to the Colstons' front door rather than to the street, it would seem to be a permissible inference, in the circumstances, that some third person, whether prankishly or maliciously, directed it that way. We wonder, as we did in *Trusty v. Wooden, supra,* why the police officer and the mechanic who repaired the Isen car were not produced as witnesses. They might have shed some light on its condition. That they were not called suggests the absence of any defect chargeable to the Isens. Chief Judge Soboloff in *Hickory Transfer Co. v. Nezbed,* 202 Md. 253, 263 (1953), summed it up when he said, for the Court:

"In this case the plaintiffs themselves proved the details of the happening, foregoing reliance on *res ipsa loquitur;* and, having undertaken to prove the details, they failed to show negligence

on the part of the defendants. Indeed, they explained away the possible inference of negligence. Paradoxically, the plaintiffs proved too much and too little."

> *Judgment reversed.*
> *Judgment entered in favor of appellants against the appellee for the costs in this Court and below.*